Your Honor, David Zuckman on behalf of David Grummer. Your Honors, thank you for leaving this matter on calendar. I think that this is a very important case. I hope to reserve a couple minutes for rebuttal. Actually, just a few minutes ago I was speaking with Ms. Serrano and she asked me candidly, what do you think we should have done? How should we have done this search such that it would have been all legitimate? Because, of course, there's no objection to the first warrant. The first warrant for the EPA case, the government clearly had a right to, had probable cause to go look at Mr. Grummer's computers and search for DDT, Chlordane, the other environment-destroying chemicals that Mr. Grummer was engaged in the illegal sale of. However, I don't think that authority extended to taking a picture-by-picture tour of his computer. I don't think that the warrant... Well, computers are, of course, only Boolean strings, ones and zeros. And you can have a computer actually search itself. That is OCR technology, optical character recognition. With respect to the Chlordane and the DDT, how could you search the graphic files for that? There's a couple different ways. The first is that Mr. Grummer was not the most sophisticated of criminals. He emailed through the email address, David, I don't know exactly where it was, at yahoo.com. He, as far as I can tell, took no effort to disguise who he was. He had a cell phone number, everything else. The government could time and date exactly when. They could track back because they knew particular dates when things occurred. And the nice thing about computers is you can manage them by date, for instance. Files have unique date extensions. But you can also change the file extension so that a JPG picture is saved as a DOC. And if I'm employing some of the sniffer software, for want of a better term, and I'm only looking for JPG files, I'm not going to find the incriminating picture that got stored under the DOC file. I'll be fair, you're arguing with our best expert on this. All this stuff he's arguing, I'd say you do and you'll clean it up. I don't understand a thing he said, but he understands it. I do my homework, so I understand what he was on about. In all fairness, I chaired the Criminal Rules Committee when we amended Rule 41 specifically to address the computer search problem that you're challenging. So be forewarned. Okay. And I think it's a fair question. Your Honor is asking, well, because you can always change file extension names, you can change descriptions. I mean, because they are just Boolean strings, you can always change what the ones and zeros appear as. How do you control for that? And the first thing I would like to say is that in this case, there's no evidence whatsoever that Mr. Grummer was engaged in anything like that. How can the agents know that before they start the search? And Mr. Zucman, I'll tell you, I'm influenced heavily by the fact that we conducted public hearings on behalf of the Judicial Conference Committee on the Federal Criminal Rules in which we heard experts testify as to how information can be stored and hidden on computers. And the committee very much had that in mind when it adopted the revisions to Rule 41 that you're concerned about here. Fair enough. Although, Your Honor, of course, it wouldn't be frozen in time. It wouldn't be the state of technology when those rules were adopted is now the — Well, it's now probably antiquated technology, and it's even more sophisticated than it was the last time we visited the subject. Yes, but what Your Honor is suggesting, which is, I believe, a thorny problem, like how do you exactly define how you can search for these strings, I don't think that the end result of that should be that you should be allowed to go through somebody's picture files one by one by eyeball. But don't we — we began, I think, with the legal analytical framework of whether or not it is reasonable under the Fourth Amendment. Yes. That is the test that the court has to apply. So in order to grant you relief on your argument that the search was, I guess, overbroad, for want of a better term, we would have to find that it was unreasonable as a matter of law under Fourth Amendment jurisprudence for a forensic computer examiner to look at individual file folders, folder by folder, to see what was in them. And how is that any different from walking into a suspect's home or office, finding a file drawer, and opening a file drawer and going through each file folder by folder in the drawer to determine whether there may be evidence of RCRA violations inside each file folder? I think there is a distinction. And here is the distinction I would draw. The first is, is that the file folder that Your Honor is describing, when someone — when you take all the pictures off someone's computer and put them in one place, you know that you've swept in all kinds of stuff that is probably not related to what you're supposed to be looking for. You're referring to taking a ghost image of the hard drive. Exactly. Of the entire — Which was done in this case. Yes, it was. So we know that as of the date of the search, when the ghost image was made of the contents of the computer, that's frozen in time. Yes. Okay. Yes. And frozen in time, they froze the entire computer in time. Right. And they knew certain things about Mr. Grummer from their extensive investigation. Probably know — they knew a lot of things about Mr. Grummer. Yes. Particularly, they knew, for instance, the dates upon which he, you know, sold the Chlordane. They knew — just backtracking from that particular information. But what if he made — what if he made sales that they didn't know about? Oh, yes, yes. But let's assume that's true. Let's assume that the government was really trying to crack the case that had already pled guilty and was pending sentencing. The — whatever data he put in there, like, say, he uploaded a picture or he, you know, from the email he put in particular text, you could then search for that unique marker. So the question is, could they find things that were simply totally unrelated? Like, let's say he had a secret sale six months earlier. You'd never be able to establish that link, but there wouldn't be probable cause for that other sale. Well, I mean, but now we're getting into the plain view doctrine. If they have probable cause to believe that he's engaged in RCRA violations and they are looking for evidence relating to environmental crimes, if they stumble upon a sale that they didn't know about, why — they could do one of two things, I suppose. They could go get another warrant to authorize them to search for more. But I'm — but you concede that there was probable cause to issue the first warrant. So I'm going to assume for purposes of legal analysis that if they came across evidence of other RCRA violations, they could seize it without having to get a second warrant. Yeah. I mean, arguably, as of course I argued, I think the warrant said that they could look at the entire computer pretty much without any particular restriction. I mean, what you're really saying is we should declare that it is constitutionally unreasonable for the forensic computer analyst to have done a file-by-file search as opposed to employing sophisticated sniffer software with search parameters that maybe the computer would overlook certain files and the examiner would never see what was in them. But that doesn't give the examiner the satisfaction of knowing that he has looked at everything that's on the hard drive that might contain potentially incriminating evidence. But the examiner never gets to that point. Because if you're going to do the eyeball test and it really is 100 gigabytes or now petabytes, there's just not enough time in the universe, not enough time in the human lifetime. So you're saying you can't conduct a search of that much data without employing some kind of shortcut. Correct. And there's a flip side to that coin. I mean, it's true what Your Honor says. Like, what do you do about the sophisticated computer person who knows how to hide evidence of the crime? Well, there's actually a problem with that because a really sophisticated computer expert would encrypt files. And encrypted files, as far as anyone at least commonly believed, you can't crack them. So if they are really good... We heard some interesting testimony about what the NSA can do, but that may be classified information. So I don't think I'll go any further on that. But let's just say, as I understand your argument, the problem here is just the sheer volume of data that the agents were trying to search. And through the graphics files, 480 at a time. Like, this is the maximally intrusive search. Right. And this is like Arizona versus Hicks. This is looking for the serial number. And a cynic would say, look, this is the FBI. I don't know what the percentage of these cases are child pornography cases, but it's a large number. It's growing. If our docket has any reflexes. Yes. And I'm sure your docket is growing in San Diego. As I said three weeks ago. Just think of it as full employment for lawyers. I may find another trade. If we were to accept your argument, would that mean that in a typical drug case, fairly typical, there's evidence of, say, cocaine in a house? So search warrants issued. And the police go in looking for the cocaine. And they look through drawers. They look through everything because they think there's cocaine in there. That's why they're in. If we accept your argument, wouldn't we have to send in a dog? Because, my gosh, we might find child pornography in one of the drawers where we thought there was cocaine. And the plain view doctrine says that now we can seize that or we can go out and get another search warrant because we found something we didn't expect to find. Why wouldn't that year logic say in a drug case, since we have dogs that are trained and they can sniff out cocaine, that we've got to send the dog in first because, my gosh, these human beings might see something that alerts them to another crime? And I mean with all respect. I think that the house analogies are inapt. And the reason for that is computers are just fundamentally different in the sense that. But why we could do it if we're really trying to protect from somebody seeing something other than the thing they're searching for. You say inapt. Why wouldn't it be? What's the opposite of inapt? That word always throws me. Apt. Why wouldn't the philosophy be the same? Well, let's send in the most protective search measure possible. In that case, it would be a dog. Protecting the rights of the individual from the authorities finding something else that he's doing, criminal. Here's, I think, the main difference. I think 10 years from now, your genome is going to be accessible on your hard drive. I think that the most personal associations of your life, of your being, are going to be easily accessible. And if you treat it like it's a house, there really is a serious, serious chance that the government could have access to every bit of private information about you simply by the slimmest sliver of probable cause for something. If all this is that important, why didn't anybody raise these issues to the district court? I mean, come back to reality, to the Idaho side here. Here we are. We're talking about all this stuff that's way over my head. It's like stuff I don't want to listen to that I make my law clerks do. And then I start typing on this computer of mine. And then I say, I was an old DJ. Why didn't they raise this to me? They didn't raise this over broad. They didn't raise the culling. They didn't raise the good faith. They didn't raise anything. And the poor old DJ didn't even get a chance to determine whether there was any of this stuff. The DJ did it. I think Judge Subraw, he's, Judge Subraw brought up this issue and ordered a hearing on it and fleshed out several of the questions. He did, but he didn't get a chance to talk about these two issues or three. And you had a chance to give it to him, and he was looking for it. I guess I'm in privity with the person who didn't have a chance to. Oh, sorry. I didn't mean you. I wouldn't have thought you would have been that way. But I'm just having, this doesn't seem to me that these are even issues we ought to talk about. Mem Dispo waved and did. Well, I hope that's not the case. But, you know, I mean, I understand that the brief that Your Honor received, which I hope at least provided interesting reading. Well, it depended on the day and the time of night. Go ahead. Well, I really do think that, you know, it is true that I wish that the briefing in the district court was more comprehensive and more technically focused. But the fact is, like, this search, this is really a dangerous thing to allow. Well, but golly, maybe, but bring it up at the right time. He says he's got private stuff on there. He says he shouldn't be eyeballing the stuff. I think I've got the fundaments for a. Mr. Zugle, your arguments are not falling on deaf ears. I mean, we are really wrestling with these issues in these computer Fourth Amendment search cases. And whatever we say in Mr. Grummer's case is not going to be the final word by any means. But I do have one issue that I would like you to address before you sit down, and that is the double jeopardy issue with regard to whether or not we're going to have to remand on the receipt versus possession of pornography counts. I think you have to. And I think it's clear from Shales. I think that the government, they have to specify in the indictment, say, that this was the possession and it's different. I think that's where the law has gone. I understand the government's argument that, look, we prove thousands or whatever the large number of images is, but the cases look at what's charged in the indictment and what's found in the verdict form. And you can't find it. It doesn't have to be a difference. You're admitting then that the trial testimony reflected the receipt and possession counts were for separate conduct? I only selectively deny reality. What does that mean? I'm glad to hear that. I didn't understand it, but I'm glad to hear it. Deny sounded big. Because Grummer, and this is the problem that I have, I didn't find any controlling authority on whether trial testimony was sufficient. No, but Your Honor, does find controlling authority under Shales and Davenport and Giberson that say that you need to have different ones alleged in the indictment. It must be distinctly alleged. Don't we have a plain error standard of review here? You do, but you had that in Davenport, too. I see I've gone over. I'll give you a little time on rebuttal. Thank you. Thank you, Your Honor. All right. Let's hear from the government. Good morning. Alessandra Serrano on behalf of the United States. In this case, the search was reasonably conducted in all aspects, and the question I asked Mr. Zubin before he walked in here is how could the government have done it any better? Well, they did get a separate warrant, right, as soon as they stumbled on the first image of child pornography? We did. We did. In fact, there were a total of three search warrants in this case. There was one set of warrants for Mr. Grummer's house, his work, his car, and another location. That was done in January. And then once Agent Atkinson found the child pornography on the computer, we got a second search warrant just to search the images or the copies that we had taken from the house, the work, et cetera. And then once we confirmed there was child pornography on there, we got a third search warrant to go back into Mr. Grummer's house in July of 2008 to hope to find the drives, the hard drives that we had returned to him, knowing that there was contraband on four of them. We were only able to retrieve two of them. And it's that third search warrant for his residence grabbing the same two computers at a later date that revealed additional images of child pornography that were not present when the first ghost image was taken in pursuance of the first search warrant. Correct. Just to sum it up, in January there were five hard drives that were copied and returned. And when we went back in July to go back to try to get these five drives, of those five drives we only retrieved two and then an additional third one, a new one. So at the end of the day we had five potential drives with child pornography on them. I hope that provides some. Okay. And the jury heard testimony about the new images that were downloaded or possessed in the interim. Is that right? Absolutely. Agent Green testified that there were hundreds of files on each of these different drives. And just for clarification to address a point that Your Honors brought up with Mr. Zugman, the receipt counts, counts 2 through 19, only charged images, specific images that were on two of the hard drives. They were on the Den PC drive and the Room M Bottom drive. All of the receipt counts were on those two drives. The possession counts charged additional images on those two hard drives plus images on three other drives. So even if Your Honor found, if this panel finds that there is a double jeopardy issue and remands it to the district court, there would be no effect on the sentence because the district judge sentenced Mr. Grummer to all of the possession counts to run part of it consecutively, part of it concurrently. So three of the drives, let me back up. I'm probably confusing you because I'm confusing myself. I apologize. You lost me on the last phrase. Okay. What did the district judge sentence on? The district judge sentenced Mr. Grummer to on the all 19 of the receipt counts and all five of the possession counts, part of the sentence was concurrent, part of it was consecutive. And so my, the, even if this panel finds that there was a double jeopardy issue, it would only affect two of the possession counts. And that is the counts that both the receipt counts were on and the possession counts. It wouldn't affect the other three drives that were just the basis of possession. Okay. But how can we, as the appellate court, make that determination on the record? Or do we have to send it back and say to the district court, you need to make that determination? I don't think this panel needs to send this case back to the district court. And here's why. Number one, Davenport, we were aware of Davenport and the double jeopardy issue. We put that in our trial memo. I believe there was argument about it in the motion in limine hearing, which I believe is in the excerpts of record. Second, I went to, I argued this case. I tried this case. I went to great length to try to explain to the jury, and I believe that is also in the excerpts of record, to show or to explain that if you find him guilty of these receipt counts, you can also find him guilty of possession because he had different images on the same drive. And that's what Davenport had a problem with because the government charged both receipt and possession based on the same image. And that's not the case here. Okay. But, you know, you're familiar with our line of cases in the Ninth Circuit that say in the absence of a special verdict by the jury, how can we know that the jury made that determination with as many images as they were dealing with here in their deliberations to render their verdict? Well, Mr. Germer could have raised this again before the district court and asked for a special instruction. That could have happened. We could have had a special verdict for him. Mr. Germer could have asked for that. He did not do that. But again, with the trial testimony of Agent Green, I think it was very clear that Mr. Germer possessed more than the 19 or the 18 images that were charged in the receipt counts. There was testimony, ample evidence in the testimony in the trial record that there were literally hundreds of images everywhere. Were you able to find a case? We couldn't find one that says we can look to the trial testimony in the absence of express charges or allegations in the indictment and a special verdict for him by the jury. I did not find anything. And I don't believe Mr. Carnow, who wrote the brief, found any either. So we're really looking at plain air. Yes, sir. Thank you. At this point in time, with regard to the double jeopardy issue. With regard back to the issue. But haven't we said on – I thought there was a Ninth Circuit case on double jeopardy that says even on plain error review, because it's a fundamental constitutional protection, that we can review that claim. And if we conclude that there is a double jeopardy violation, then that trumps the plain error standard, or meets the plain error standard. That was the standard to review plain error in the Davenport decision, as well as I think it's the 2008 Giberson decision. But, again, as we cited in our brief, we cited the Overton case. You like Overton better. We like Overton better. But Overton involved, as I recall, didn't Overton involve actually manufacturing pornography when he videotaped his 16-year-old daughter? Plus he downloaded and traded child pornography with other. Correct. Minded individuals. Correct. But I think what we can take away from Overton is that so long as there is evidence that the images are different, that we're not charging – it's not like we're – But we knew that in Overton because Judge Malloy was the fact finder, was he not? It was a bench trial. Yes. And so now I'm back to my conundrum with what do I do with a general jury verdict that says guilty, guilty, guilty, but doesn't tell me guilty based on what? Well, I understand the concern. Again, even if Your Honor finds a double jeopardy issue with counts 23 and 21, which were the one, the basis is of the Den P.C. and the Room M. Bottom, which were the same hard drives that contain the receipt counts, even if you find an issue there, there's no reason to remand because Judge Subraw imposed the sentence to the other possession counts, hard drives that had no images that were charged in the receipt counts. So it really wouldn't affect the sentence at all. And you're relying on this De La Fuente case for the proposition that where there's no controlling authority, there can't be plain error, as I understand it. Yes. I will say that having tried this case and preparing for this appeal, I will make sure my indictments are charged differently, including the – well, I'll leave the case that Mr. Zugman and I had three weeks ago for another day. Perhaps we'll move back here. We'll hear that down the road. I'm sure you will. All right. I'm sure you will. With regard to the search warrant issue, unless Your Honor is having more questions on the double jeopardy, on the search warrant issue, I – as I said before, I truly am curious as to what Mr. Zugman believes is inappropriate. How should we have done this? And I think in this case, the government got it right. There's no dispute that a second search warrant was obtained once we saw the child pornography. And with the way that Agent Atkinson conducted the review, although it may be offensive or bothersome to some, I think, Judge Tallman, you – how are we supposed to search these computers? And I think analogizing searches of computers to houses is an appropriate way to look at it. It's just the vast size. That's basically the difference. And as this Court held in Giberson, the size shouldn't matter how you – for a Fourth Amendment analysis. Mr. Zugman also mentions about the dates and how we could have honed in on certain dates for the environmental files. I think it's – at least if Your Honors are familiar with the experts that testified for the Rule 41 hearings, dates can be changed. I mean, it's very easy to go on your computer and change dates and to try to hide information. So that, I don't think, would have been an effective way to do that search. Well, and it doesn't address my concern that the government may not know about all of the illegal sales and the dates of those sales if they weren't made to undercover officers. Right. And I think the first search warrant would have covered those additional sales because it talked about any sales with the DDT or other unlawful chemicals. I'm prepared to submit unless this panel has any other questions. Anybody have any questions? I think not. Okay. Mr. Zugman, I'll give you a couple minutes on rebuttal if you want. Thank you, Your Honors. The dates-changing thing. A computer is only a sequence of ones and zeros. It reads back and forth. That's how the thing works. And it is true that you can change a date. However, if you are sophisticated enough to know that you should change the date, then you're sophisticated enough to know that you should encrypt it. And if you encrypt it, you automatically can't be broken as far as we know. And if you don't know to encrypt it, it's pointless to change the date. It is only an exception to allow the government to search. It's not an actual concern in the real world. Well, I mean, people do encrypt files, right, as opposed to encrypting the entire computer. Yes. So I'm not sure. But you don't encrypt it by changing the date. All you do is you assign a different value to the computer, which theoretically people don't do. Encryption is different from changing dates and extension names and that sort of thing. Yes, I believe it's the product of two large prime numbers. Okay, I'll take your word on that. Unless there's anything else I'll say. I don't think we have any further. Thank you both very much. That case was very well argued.
judges: Benson, Tallman, Smith